Welcome to all of you, and please join me and Judge Luck in thanking Judge Wendy Berger for sitting by designation with us. She comes from the Middle District of Florida, and so I'm sure she's a little bit pleased to have a little bit nicer weather as of this morning. Certainly nicer than Middle District of Florida right now, I'm guessing, but thank you. And we are going to be hearing three cases today. Our first case is the United States of America v. Jhonathan Alfonso, number 22-10576, 22-10589, 22-10590. We have several people who are going to be arguing today, and so it looks like, and if I mispronounce names, I'm sure you'll correct me when you get to the podium. Ms. Dresspool, you're going first. May it please the Court. Tracy Dresspool, Assistant Federal Public Defender, on behalf of Jhonathan Alfonso. This case calls into question the limits of Congress's enumerated Article I power to define and punish felonies committed on the high seas. The appellants in this case have raised both an as-applied challenge to their convictions based on the location of the vessel, as well as a broader facial challenge to the jurisdictional section of the MDLEA under which they were apprehended, or under which their convictions were obtained. I plan to spend most of my time today discussing the first issue in the briefs, focusing on the location of the EEZ as, under international law, as not being part of the high seas. However, both claims rest on the common thread that Congress is bound by original constitutional design to abide by international law when exercising extraterritorial power pursuant to the felonies clause, and so I'd like to start there. In United States v. Belzac-Hurtado, this Court held that Congress's power to define under Article I, Section 8, Clause 10 is limited by the three specific subjects of the clause. And again, Article I, Section 8, Clause 10 grants Congress the power to define and punish piracies. Counsel, let me fast-forward a little bit. Belzac was about the law of nations clause, the third of the clauses. In Campbell, though, what we said, and what I understand that we said, was that A, we're relying on the felonies clause in a drug trafficking instance, and B, we have never held that Congress does not have the authority to punish extraterritorial drug trafficking in any event. Now, that's relevant to the question that I think you're raising, which is that in Belzac, we were limited to the law of nations, and we said explicitly that drug trafficking is not prohibited by international law. But in Campbell, in applying the felonies clause, we explicitly said we did not limit ourselves in any way to international law, and said as to the same issue, as to the same statute, when applying the felonies clause, it seemed to be perfectly fine to extraterritorially punish drug trafficking. So how then, I guess is my question, is how are we limited to the law of nations or international law when discussing the felonies clause, given what we said post-Belziac? Okay. So there's two parts to that question. And I wanted to address Campbell first, but the prequel is that the analysis in Belzac-Curtado is relevant here for reasons I will get to after addressing Campbell. Quickly. I don't recall any argument in Campbell that Congress was bound by Article I to follow international law. Campbell addressed very different challenges to the MDLEA. I think there was a nexus clause. But there's no way we could have found in Campbell that extraterritorial drug trafficking is within Congress' power if we were limited by international law for the felonies clause. This Court does not decide constitutional issues sub silentio. That was an assumption. That's not sub silentio. That's — The issue was not presented to the Court, Your Honor. I don't think so, Your Honor. This Court made very clear just this year in Jackson and Penn that it is not only the facts that matter, but the legal issues that are presented to this Court. No one has ever argued to this Court that Congress is bound by — I'm not doubting — you're right that no one's ever made the exact argument that you're making. No one's saying you're precluded from making the argument. But the argument you're making is that we are limited in reading the felonies clause by international law. And it seems to me that we have decided that issue. Now, let's put that aside for the moment. Your argument seems to be this. We have to read the High Seas Clause as it's understood, but then we read it under a modern conception of what international law is. That seems to be very inconsistent. So it may at first blush seem to be inconsistent and — And at second and third blush. Well, give me a chance, okay? Because the definition of the High Seas does not depend on geography. It depends on what the High Seas has always meant is a lack of sovereignty. No, it seems to me that the High Seas Clause from time immemorial has meant one thing. And I will agree with you on this. Where the territorial seas are has changed over time and is a bit fuzzy. But what it always seems to have meant is the sea that is seaward of the territorial jurisdiction of the sovereign. That seems to be the consistent thread throughout the definition of territorial seas at the time of the founding. Am I wrong in saying that? I just don't think there was any other option. I don't think it was considered. At the time of the founding, all nations were concerned, and the founders were very concerned, with interfering what they called the perfect rights of a foreign sovereign, just as Gorsuch discusses this in his concurring opinion in Jesner v. Arab Bank. Interfering with the perfect rights of a foreign sovereign was cause for war. And so when the founders got together and put all of Congress's extraterritorial powers into the Define and Punish Clause, they were very concerned not only of granting a remedy to individuals who were offended pursuant to the law of nations, but with restraining the United States' powers and respecting that of other nations. But so how does that help you now in jumping to a modern conception with the EEZ? Why are we going to look to that modern conception rather than, as we just discussed, what the considerations were at founding? Because at the founding, there were only territorial waters and international waters. And why don't you lose because of that? Because the Constitution doesn't say outside our territorial waters. It says high seas. Right, but high seas, by definition, were those waters that were outside or seaward of territorial waters. But the relevant characteristic of high seas was not the geography. It was the lack of sovereignty. It was the lack of sovereignty. I'm not sure that that's right. I will tell you that I've looked at this as deeply as I possibly could. And it seems to me that the concern was where that sovereignty extended to. And there was debates that it extended to rivers and bays and only that, and essentially everything up to the coastline was high seas. And then there were those like Jefferson and Washington who said it's within cannon shot, about three miles, one English league. And that's where we get the three miles from was Jefferson in 1794 sends a letter to all the major powers that says, here's how we read it and that's the way it is. And that became the international law standard. I don't, I'm having trouble understanding how that, however you and I can argue about what the limited territorial seas were. It seems to me high seas was everything outside of that. But the founding characteristic, and maybe I need to take a step back and talk about the fine and punish clause as a whole. OK, because the fact that Congress is bound by international law under the defining and punish clause is critical to this argument. And if the court looks in Belezec-Hurtado, the court held that Congress was bound by the law of nations not only because of the words, but because of the original understanding of the word defined. Even if I accept your framing, though, even in Belzec, we did not answer the question of whether international law existed at the time of the founding or later. And I have to tell you, if we were to answer that question, I don't see why we would leave it to the shifting whims of international law from here until eternity. Because I think that's what the framers anticipated. And certainly that's what the Supreme Court has found in the context of the alien tort statute, which was enacted in 1789, shortly after the passage of the Constitution, in order to provide a forum for civil torts under the law of nations. And at the time of the founding, there were only three law of nations offenses. There were piracy, interference with safe passage, and offenses against ambassadors. Over the years, although it's been very restrained, the Supreme Court has recognized in the context of the alien tort statute that that has grown to include some human rights violations. Universal jurisdiction has also changed. At the time of the founding, there was only piracy. Certainly today, the United States would not want a holding that we have. But that doesn't help you. Sorry. So we have now a situation under international law where we do have these EEZs. And so even assuming these are distinct from the high seas, why wouldn't vessels that are navigating in the EEZ be treated as though they were effectively on the high seas? I'm not seeing that connection. Okay. So the government has made this argument based on language in I think it's Article 88 and Article 58 of the UNCLOS, which the government has conceded reflects current international law, that the EEZ is without prejudice to the rights of all nations on the high seas. But if the Court looks at the title of Article 58, it just says the rights of other states in the EEZs. It's still very clear that it says the zone is the EEZ. The same thing vice versa. And the drug trafficking provision the government is pointing to only offers cooperation. It's not a specific grant of jurisdiction. There are a few more points. Can you point to any judicial decision holding that the EEZ is not part of the high seas? I can't. No, Your Honor. So if we agree with you, we would create a circuit split with the Fourth Circuit, correct? Well, yes. Yes, I think that's true. I will say in the Fourth Circuit it was very confusingly argued. I listened to the oral argument. And what the appellants actually wanted the Fourth Circuit to hold was that the land in the EEZ was actually Somalia's territorial waters. At one point they conceded that the Court shouldn't look to international law. Our position is under international law it is very clear, and the United States government has reflected this in the CFR, that under international law the EEZs are not the high seas. And I can point to two more provisions that are not in the briefs, if I may, from the EEZ that support this. And the first is Article, I believe, 89, which talks about no state shall exert sovereignty over any part of the high seas. Now, the coastal states are expressly given sovereign rights in their EEZs. I'm going to let you finish this thought, but you're now over time. Yes, I understand. One more point. The other point is Article 116, which grants states fishing rights in the EEZs. If the EEZs were merely a part of the high seas where they had fishing rights, Article 116 would be phrased very differently than it is. All right. Thank you, and you have three minutes for rebuttal. Thank you. Mr. Dominguez, it looks like you've got a minute. Yes, Your Honor. Thank you very much. May it please the Court. I did want to go a little bit more fact-specific in relation to my client. My client is a citizen of the Dominican Republic, and this is a little bit different. And I refer to John Jay and Madison, John Jay specifically in Federalist 3 and Madison in 42, referring to respect of other nations. Now, the Dominican Republic is a signatory to the EEZ and does recognize that zone and recognizes that vessels have the right of innocent passage. Now, as applied in this situation to my client, who is a citizen of the Dominican Republic, it's a little bit different because you have a United States military vessel firing upon a boat to disable it, could have shot the citizen of the Dominican Republic, basically doing an act of war in the EEZ. They weren't fishing. They weren't conducting innocent passage. They were firing on a vessel without knowing what was on it or who was on it. And that's basically what they were doing. A stateless vessel in the high seas. They don't even know it's a stateless vessel. They basically see a vessel. It's a small boat. It could be a group of fishermen. It could be anybody. And they fire upon it because there wasn't any indicia at that point. They didn't know anything further than that, other than we don't fire on people for reasonable suspicion. I'll exceed your time. Thank you. And, Mr. Cabrera, you also have a minute. Good morning, Your Honors. May it please the Court. My name is Raj Cabrera. I represent Mr. Cohen in this action. And if you could, just into the microphone. Yes, Your Honor, I'm sorry. I just wanted to address one further matter with regard to the statelessness of the vessel, which we do address in our briefs. Specifically, Mr. Cohen's conviction was obtained in violation of Congress's limited powers under the Felonies Clause for an additional reason. A review of the text, history, and structure of the Constitution shows that Congress's power under the Felony Clause is limited to those felonies which the United States has a right to prosecute under international law. Congress exceeded those boundaries when it defined vessels without nationality under 46 U.S.C. 70502D to include vessels for which a valid prima facie showing of registry has been asserted. To touch upon Mr. Dominguez's argument just a second ago, it was treated as a vessel without. Didn't we say in Nunez, though, that there's no established basis for statelessness? In other words, international law doesn't have a mechanism to say this is what's stateless and this is what's not. It's sort of left up to each jurisdiction to decide. And given that, how can we say that there's a violation of international law? Your Honor, I'm not familiar with the specificity as to Nunez. But in this particular situation, you could claim nationality or you could claim a state. A vessel could be declared by a state or by a nation by the flag or just by simply declaring, make an oral declaration that they're registered or part of a particular nation. In this case, that was done. But there was no one who identified as the master of the ship, correct? No, Mr. Cohen did. He identified himself as the master of the ship. He also made a claim of nationality under Columbia. And here the government said that it could not confirm or deny that it was registered with the government. Can I go to the facts? I have to push back a little bit on that. This is docket entry 62 at pages 1 and 2. This is the factual proffer. I have the one here for Mr. Alfonso, but they're essentially the same. Quote, once the GFV was dead in the water, law enforcement from the Wichita arrived and completed a right-to-visit boarding of the GFV, the vessel. There were three individuals on board who were later identified as Alfonso, Cohen, and Rosario Rojas. When asked, none of the crew claimed to be master or person in charge of the vessel. Forgive me. I saw that somewhere where Mr. Cohen eventually— We could talk about it in the rebuttal, but I just wanted to point that out. No, I appreciate your honor, and my apology. I didn't mean to mislead the court. But respectfully, in this particular case, the claim was eventually made by Mr. Cohen, a claim of nationality for the vessel. The government could not confirm or deny, but we don't know what they did or what affirmative steps they took to confirm or deny that particular aspect. And you have exceeded your time, so thank you, Mr. Cabrera. Mr. Cohen. Good morning. May it please the Court. Jonathan Cohen on behalf of the United States. Mr. Cohen, let me jump right in because we don't have a ton of time together. I just want to understand the government's position. I've read your brief. I've read everything. But I need to clarify what your position actually is. Is your position first that the Felonies Clause is limited to the law of nations slash international law? No. The Felonies Clause, because it's distinct from the Defense Against the Law of Nations Clause, is not limited by international law. It's also our position that no international law contradicts the powers here. I understand that. But I meant the linchpin, as Ms. Dressel said when she was up here, the linchpin of her argument is that the Felonies Clause is limited by international law. If you take that linchpin out, there isn't much left to it. Is that right? Yes, Your Honor. I mean, you can rule on either basis. Whatever the Court would find easier, of course, you could either avoid the question of answering whether international law limits the Felonies Clause or you could rule that no international law provision contradicts either part of the assertion of jurisdiction here. Okay. Let's assume for the moment that international law does apply. Is it the government's position that we interpret international law to be at the time of the felony was committed as opposed to what the original understanding was at the time that the provision that we're interpreting was ratified? I think you have to look at the original public meaning of the phrase when it was used, and I'll explain how I get there. Even Professor Kontorovich, whose writings form the basis for the appellant's arguments in their briefs, recognized that it's not that international law controls the question. It's that when the courts look to define the terms used in the Constitution, Professor Kontorovich says you would have to look to international law. I would rephrase it this way. When the court looks at the original public meaning of the phrase as used by the I think as the court has recognized, distinguishing the open ocean from national waters. I ask this question, and I'll ask of your opposing counsel, and I'll ask it to you. It's my understanding of the high seas as sort of a general definition of that sea, which is seaward of the territorial seas. Yes. As this court has recognized on several occasions, as we cited. So the only question really is where the territorial seas are. And I think there is some debate, both at the founding and maybe even now, about where that is. But there is no debate about that being the definition of high seas, is there? No, I don't think so. And about the confusion, and I want to speak to this about where the territorial line is because I think it informs our discussion. That constitutional grant of power was limited geographically. I mean, that's clear. It's limited to felonies committed on the high seas. And again, we suggest you look to the original public meaning of high seas from territorial seas. And it is true that territorial seas, that line has changed over time. But that is a function of, because I actually agree with Mr. Eisfel on the idea that sovereignty is something that informs territorial seas. And the United States has the right to recognize sovereign claims of our foreign nations, including, as the Supreme Court discussed in Zivotofsky v. Kerry, the territorial line, where that sovereignty extends. The bail case in the Fourth Circuit that is, I think, got the unclosed application exactly right, the United States there, the nation that was claiming the EEZ line, Somalia, was trying to claim sovereignty beyond the 12-mile limit into EEZ. And the United States did not recognize that sovereignty, did not recognize that its sovereignty extended any further than its territorial sea, the 12-mile limit. So, yes, the United States can recognize a change. Pre-UNCLOS, is there any point at which the territorial seas was ever understood to be more than the 3-mile barrier? Your Honor, I'm not exactly sure when the 12- to 3-line. The 3-to-12 is the contiguous zone. I don't know that I've ever understood that as being the territorial seas. There's some sovereignty that's extended over that, but the territorial seas, as I understand it, has always been 3 miles. Do I have that wrong? Your Honor, perhaps this is my confusion. My understanding, and I don't want to overstep my understanding and speak for the government, even though I am, of course, here for the government, is that at least for these purposes, we recognize, certainly for MDLEA purposes, we recognize 12 miles as the territorial sea, as extending your right to control your criminal authority, the coastal nation's criminal authority, up to a 12-mile limit. We don't recognize it beyond that. When Somalia tried to extend its sovereignty beyond that, we don't recognize that. And that is a function that is granted. To recognize or not recognize that extension of sovereignty is a function granted to the  Do you understand that the high seas, that definition was as understood at the time of ratification? That the definition, we're not limited by the line. We're limited by the definition at the time of the ratification. And that understanding, that definition, was distinguishing open ocean from national waters. Territorial seas. That seems to be the word that's used by everybody. Yes. Yes, I agree. Territorial waters, that is the line. But I'm defining the function of why we've extended territorial waters, why we've recognized the extension of territorial waters. Because there is some, I think your opposing counsel is right, that there are some portions of the UNCLOS treaty which seem to suggest that the territorial seas, I'm sorry, that the high seas does extend out to or does not include or excludes the EEZ. There's at least some portions that suggest that. You agree? Let me address that, if I can. No. And I want to be clear of the distinctions that I'm drawing. UNCLOS is very clear, repeatedly, and in fact Mr. Isepul was citing it there at the end, that sovereignty does not extend beyond the territorial seas. And that is the line that we think defines territorial seas from open ocean. But where UNCLOS distinguishes high seas from EEZs is limited specifically to economic rights. It is an extension of economic rights. It's not a constriction. I know, but if the concept is sovereignty, if we accept this premise that it's sovereignty, and that that can change over time, so we accept all of those premises, there does seem to be some suggestions in UNCLOS that sovereignty, at least with regard to some rights, is extended in the EEZ zone, specifically mineral rights and things like that that can be explored. That's the argument they're making. And so if there is some sovereignty that's extended there, then the high seas is excluded from that area from there, and then apply to this case, since we're only 60 miles out, that would apply to the Dominican Republic here. I have to respond that UNCLOS does not call that sovereignty. It repeatedly distinguishes sovereignty from what it grants in EEZs. It very specifically, I think, in the provision that Driscoll cited, that it is not sovereignty, what it's extending. And, in fact, within the EEZ, even though there might be some rights afforded nations, they cannot preclude others from passing through. Exactly. In several places, UNCLOS makes sure that it preserves and recognizes that the nature of the open seas, of the high seas, which includes free navigation, which includes the right to board and verify the nationality claims of vessels, all of those things which are defining features of the high seas exist in EEZs. That is not constricted by the extension of economic rights. Article 110, I think, is very important, in fact, to both parts of this case, both the EEZ argument and the D1C argument about statelessness claims. So I want to just briefly talk about Article 110. Article 110, which is specifically preserved in the high seas, as we noted in our briefs, talks about the right of nations to have what's called right-of-visit boardings and inquiries, stopping and detaining a vessel in order to, among other things, verify its nationality claims. And that word verify is extremely important to why it extends to both parts of this argument. As this Court has repeatedly recognized, stateless vessels have no right to free navigation on the high seas. And that is why the McPhee case and the Rioseco case specifically are, I think, still informing of this decision, even though the exact arguments weren't made. Because the right-of-visit authority only exists on the high seas, Article 10 grants that authority under international law to stop and detain and conduct an ROV, right-of-visit boarding, on the high seas. Let me ask you this. Does it matter that none of the individuals on this boat claim to be the master? Is that significant? No, Your Honor, because when – I believe it was Mr. Alfonso, whichever one it was, who made a nationality claim for the vessel. He was then treated as the master, even though no one acknowledged being the master. The law has changed on that since this case. How is that true? Even – this goes to the statelessness argument, the opposing counsel's second argument, which we didn't much get to. But that argument is premised on there being a claim by a designated – by someone who claims to be the master or captain of the vessel. Here, nobody claimed. Under the factual proffer that we accept, nobody claimed to be the master. Yes, somebody said this is a Colombian boat, a crew member, but nobody claimed to be the master or captain. How under even their framing, accepting all of their framing of it, do they even win under the factual proffer that we have here, the very limited factual record? Your Honor, if this Court wants to rule that when no one claims to be the master and yet makes a claim of nationality for the vessel that that's not a valid claim, I would be very happy with that ruling. It's been much debated in this Court and in the district courts for a long time. The law has changed on that fact. The statute was amended recently to say that when no one claims to be a master or recognizes as the individual in charge that that's the end of the matter. The confusion comes, Your Honor, in that some panels of this Court in unpublished decisions have asserted that there is a distinction between a master and a person in charge. It's our view that that's referring to the same person. That's just referring to the person who speaks with authority for the vessel. Master isn't a title granted by the cartel naval academy. I want to ask something else about the second argument that we didn't get to, but I want to tee it up for the rebuttal. Now, I agree under class that even where someone pleads guilty, that they have the ability to raise a constitutional claim. You agree with that premise? Yes. You do not waive your claim by pleading. You do not waive a constitutional challenge to Congress's authority by pleading guilty. Right. Now, class, though, is premised on someone who actually raised that very claim below in the litigation on a motion to dismiss, right? Yes. Did that happen here with regard to the statelessness argument? No. Then what do we do with that? It is our view, Your Honor, and we've argued in other cases and are continuing to argue that the plain error standard would apply to a constitutional challenge to the statute that is not raised below. Of course it would. We apply plain error to constitutional arguments all the time. Absolutely. We agree that they can argue it. It's not waived, but plain error should apply. Here, though, because they have challenged the constitutionality of the statute below, we did not press the plain error argument because to draw the distinction is that they made one constitutional challenge. You can't waive our standard of review. So our standard of review is what it is. Then I leave it to your ---- If we apply plain error review for an argument that was not raised below and is raised for the first time on appeal, regardless of whether there was a plea or not, in other words, that we treat it the same way we would treat any other appeal, how, if we all agree that this is a claim of first impression that hasn't been decided before, would we be able to resolve it on plainness grounds? I mean, certainly under plain error review, there is no controlling decision in their favor. I would suggest that there are controlling decisions against their position that this Court could recognize, as Santos Santana has done in an unpublished panel decision from this Court, saying even under de novo review, because there are controlling decisions, their claim would be precluded. How would you reconcile that we have the de la Garza decision where we said, on board a vessel subject to the jurisdiction of the U.S. is Congress's limit on the Court's subject matter jurisdiction and issues of subject matter jurisdiction, would they not be subject to de novo review? I think the phrase jurisdiction has been used somewhat differently in different cases, which has led to some confusion on this issue. Again, it's our position we were doing under either standard of review, so I don't think the Court would necessarily need to unpack that all in this case. In my limited time, I would like to briefly address the statelessness issue, if I can, unless Your Honor wants me to. Let me ask you a question about that. Does international law define or otherwise circumscribe the conditions under which a nation may conclude that a vessel is stateless? No. In fact, under Article 110 of UNCLOS, it grants authority to nations conducting right of visit boardings to verify a nation, a nationality claim. Nothing then prescribes how that claim is verified. So the fact that Article 92 presents two examples of claims that are defective, when you fly multiple flags, that is a defective claim. That has nothing to do with limiting how one, under Article 110, verifies a nationality claim. This Court has recognized in various cases states grant nationality to vessels. Vessels don't assume that status for themselves. They might make a claim, but under Article 110, that claim must be verified, as the United States did here through its international agreements and its relationship in the decades in which the amendment of the ALEA has been in effect. The nations that the appellants argue whose rights are being trampled, what they're essentially arguing is that the territorial nation or flag nation's prior jurisdictional claims are being usurped. Those nations don't think so. This Court has repeatedly recognized that any violation of international law in terms of assuming jurisdiction are diplomatic issues regarded to the diplomatic arena, and they're merely in the statute for the comity of foreign nations. Since no nations have complained that their rights have been trampled here, we urge this Court to affirm the convictions below. Thank you, Mr. Cullen. Ms. Dresspel, you have three minutes. Thank you, Your Honor. I want to, before addressing the Court's questions on the issue too, I'd like to go back to the EEZ for a minute. Your Honor brought up the contiguous zone, and under Article 33, it's very interesting. All states are given certain rights of control in the contiguous zone. It does not use the phrase sovereignty, which is, in fact, expressly used in Article 56A. So there's a very different way between the way the contiguous zone is treated versus the high states. It seems odd, though, that you would give more sovereignty or there would be more protection for a state really far out but less from 3 to 12. But that was how it was negotiated. And I cited an article in the reply brief by authors Galdarisi and Kauffman. I don't think I mentioned they're actually U.S. naval officers, and they go through this. It's a very helpful article that goes through the history of the development of the EEZ and the negotiations that make clear the EEZ is not treated as the high seas. Can you talk about some of our case law regarding the protective principle and the universal principle and how they've been applied, even in claims where it's within the territorial seas or the sovereign seas of a nation? Okay. Well, so I view that, first of all, the universal principle cannot apply, and we know that because this Court has squarely and unequivocally held that drug trafficking is not an offense against the law of nations. And if it's not an offense against the law of nations, it cannot be treated as such by any nation of the world. There is much dicta in the Court's opinions about the protective principle. But to hold, the Court has never expressly held that the protective principle applies to drug trafficking. And if it did so, it would effectively be making the protective principle broader than universal jurisdiction. And the Court can look. I would point the Court to Judge Barquette's special concurring opinion in Beleza-Cortado when she goes through the principles of international law and finds that no principle of international law applies to drug trafficking. It's never been adopted. And as you said, at least in dicta, maybe more, but at least in dicta, we've said expressly the opposite by multiple panels of this Court going back about 20 years. That's absolutely true. And that is why I'd like to focus on Issue 1, because while I disagree with that and I do think it's wrong, I will acknowledge there's no fewer than 10 cases addressing dicta. I think it's wrong, as Professor Kantorovich pointed out in his law review article, the protective principle really only applies to limited state interests that affect the sovereignty of a nation, and it should not be applied here. But if I can go back with my time is running out, I want to end with a hypothetical to show remembering the framers' concern about interfering with another sovereign's rights as an existential threat to our young nation. I want to give a hypothetical as to why we cannot consider the EEZ to be the high seas under the Felonies Clause. Our drug trafficking cases, every one of these MDLEA cases, has the same pattern. There are helicopters overhead. They issue warning shots. If the boat doesn't stop, they issue disabling fire. The defendants throw the cocaine overboard. They're overtaken by the Coast Guard. The Coast Guard comes in on a high-speed chase. They throw the cargo over. They throw bales of gasoline over. They burn the ships. They sink the ships. That has to be a hazard to the marine life and the ecosystem in the EEZs. You have exceeded your time. Yes, Your Honor. My final thought simply is that you have exceeded your time. Thank you, Your Honor. All right, we have your case under advisement. Thank you.